Diana J. GILLISPIE, Appellant,

v.

B & B FOODLAND, Appellee.

No. S–5657.

Supreme Court of Alaska.

Sept. 30, 1994.

Charles W. Coe, Anchorage, for appellant.

Robert L. Griffin, Mason & Griffin, Anchorage, for appellee.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

*OPINION*

MOORE, Chief Justice.

INTRODUCTION

Appellant Diana Gillispie filed an Application for Adjustment of Claim before the Alaska Workers' Compensation Board (the "Board") for back injuries allegedly arising out of three work-related incidents. Her employer, B & B Foodland ("B & B"), controverted the claim. Following a hearing, the Board issued a decision denying and dismissing Gillispie's claim. The Board concluded that B & B had rebutted the presumption of compensability with substantial evidence and that Gillispie had failed to establish the compensability of her claim by a preponderance of the evidence. Gillispie appealed to the superior court, which affirmed. She then appealed to this court. We now affirm the Board's decision denying Gillispie's claim.

FACTS AND PROCEEDINGS

Gillispie was employed as a cashier by B & B in Soldotna from January 1990 until the fall of the same year. She alleges that she injured her back on several occasions during her employment with B & B.

The first of these injuries occurred on February 2, 1990, when she allegedly twisted her back while stocking shelves. As a result of the incident, Gillispie was off work until August. She received temporary total disability (TTD) payments during this time. The second alleged injury occurred on Sep-

tember 2, 1990, shortly after her return to work. She missed one week of work after this incident. She did not receive compensation during this period. Finally in November, she again alleged that she had injured her back.[1] Gillispie has not returned to work since this injury. Following the November injury, Gillispie received five days of TTD benefits.

On December 5, 1990, B & B controverted her claim. Gillispie then sought a hearing before the Alaska Workers' Compensation Board requesting TTD and medical benefits. At the hearing, the following evidence was adduced:

(1) On December 20, 1990, a CAT scan revealed that Gillispie suffered from a ruptured lumbar disc at the L5–S1 level on her right side. Dr. Reinbold, an orthopedic surgeon, later confirmed this diagnosis following a physical examination accompanied by a battery of tests. He recommended surgery to alleviate the problem.

(2) Two physicians, Drs. Christine and Donald Peterson, were employed by B & B's insurance carrier to conduct further tests aimed at determining whether such surgery was necessary and whether Gillispie was feigning her injury. The physicians conducted a physical examination of Gillispie and reviewed her prior medical records. These records indicated several prior treatments (including the use of narcotic medications) for recurring lower back pain during the period 1984 to 1989. The physical examination consisted in part of several tests designed to reveal whether Gillispie was giving false positive responses to pain. Gillispie gave one false positive response during the testing. The physicians also conducted one test which would be indicative of a herniated disc, which was positive. Based upon their examination, the doctors concluded:

It is not entirely clear that Mrs. Gillispie had objective low back injury either before or after the 2/90 incident. It is entirely probable that Mrs. Gillispie used lumbar

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. In October, prior to the third back injury, Ms. Gillispie had also fallen and broken her wrist. She missed one week of work as a result of this injury.

complaints as a way of obtaining narcotic medications and muscle relaxants....

....

In my opinion, her multiple complaints and reported injuries are largely subordinate to and a part of this drug seeking behavior. There is no evidence of a new significant injury to the lumbar spine.

Based upon these findings, the physicians opposed surgery. In addition, both physicians questioned the significance of the CAT scan and testified that the incidents at B & B were not substantial or significant factors in bringing about her condition.

(3) Gillispie's treating physician, Dr. Davidhizar, also opposed surgery. He stated that "I have reviewed the CAT scan report which indicates some mild bulging ..., but no obvious indications that this is causing the patient's discomfort." He further suggested that "she may have had that disc for years." He also testified that the bulge on the CAT scan was of no clinical significance and that, following the incidents at B & B, Gillispie returned to her pre-existing condition that Davidhizar had been treating for the previous several years. Finally, he also informed Dr. Reinbold that "I'm not sure she's a real good candidate for surgery.... She's sure heavy into drugs."

(4) On March 20, 1991, Dr. Reinbold proceeded with the surgery. Regarding the surgery, he testified:

We opened her back, and we looked, and we retracted her S1 nerve root and dura, and there was an underlying disc protrusion. There was no evidence of a frank rupture of the posterior longitudinal ... ligament, and no evidence of free fragment. But she ... did have a disc popped up, not—not real impressive, but it was there.

Dr. Reinbold further testified that the disc was pressing against a nerve. However, he also noted that, while the incidents at B & B could have caused her condition, he felt that her falls were probably insignificant.

(5) Dr. Reinbold, based upon his observations during the March 1991 surgery, concluded that the disc injury was relatively recent. "Well, it wasn't ... really old like three to five years. It would have been within the last year or two. Yeah, you can tell that." However, he could not definitively determine when the ruptured disc occurred.

(6) Gillispie's extensive medical record included several neurological and physiological tests from 1984 to 1989 relating to her back pain. During this period, Gillispie underwent eight "straight leg raise" tests, which could be indicative of a ruptured or herniated disc. Five of these tests were negative. The first positive test occurred on July 20, 1984. However, a neurological examination four days later was negative. In addition, a second follow up examination a week later was likewise negative. The second positive test occurred on March 28, 1989. A retest six days later resulted in the third positive result, although the result of this test was only "questionably positive." Three days later, a third straight leg raise test was given, with a negative result. A follow up neurological examination a week later was also negative.

(7) In May 1989, Gillispie was examined for the last time prior to her employment with B & B. Gillispie went to the emergency room at Central Peninsula Hospital complaining of lower back pain. Dr. Cooper, the examining physician, testified that nothing in her medical history or his examination of her led him to believe that she had a herniated disc at that time. Based upon his examination, he concluded that Gillispie most likely developed her injury later. However, he also testified that it was possible that Gillispie's disc injury predated his examination of her.

(8) On October 26, 1989, prior to her employment with B & B, Gillispie filed an application for public assistance with the State of Alaska. In this application, she stated that she "has a pinched nerve in lower back which has caused nerve damage down legs."

(9) Immediately prior to starting work with B & B, Gillispie completed a pre-hiring physical condition questionnaire. She filled out a similar, post-hiring questionnaire subsequent to her hiring. On both of these questionnaires, Gillispie indicated that she did not have, and had never been treated for, back problems.

On February 4, 1992, the Board rendered its decision. The board found that Gillispie had established a preliminary link between her injury and her employment at B & B. Thus, the presumption of compensability attached. However, the Board concluded that B & B had rebutted the presumption with substantial evidence. The Board further held that Gillispie had failed to establish her claim by a preponderance of the evidence. Thus, the Board denied her claim. Gillispie appealed this determination to the superior court, which affirmed. This appeal followed.

DISCUSSION

1. *The Presumption of Compensability*

■ Alaska Statutes section 23.30.120(a) provides that "[i]n a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that (1) the claim comes within the provisions of this chapter." This presumption of compensability extends to the existence and the work relationship of the disability. *Wien Air Alaska v. Kramer,* 807 P.2d 471, 473–74 (Alaska 1991).

■ For the presumption to attach, the employee must establish a preliminary link between his or her employment and the injury. *Burgess Constr. Co. v. Smallwood,* 623 P.2d 312, 316 (Alaska 1981). This threshold showing is minimal and requires only that the employee offer "some evidence" that the claim arose out of his or her employment. *Robinett v. Enserch Alaska Constr.,* 804 P.2d 725, 728 (Alaska 1990).

In the present case, the Board held that Gillispie had established the preliminary link between her injury and her employment necessary for the presumption to attach. The Board relied on Gillispie's testimony that she was injured at work, as well as the medical testimony of Drs. Reinbold and Cooper. B & B does not dispute this finding.

2. *Rebutting the Presumption of Compensability*

■ As provided in AS 23.30.120(a), to overcome the presumption of compensability,

the employer must present substantial evidence that the injury in question is not work-related.[2] *See, e.g., Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grainger v. Alaska Workers' Comp. Bd.,* 805 P.2d 976, 977 n. 1 (Alaska 1991) (citations omitted). In *Kessick v. Alyeska Pipeline Serv. Co.,* 617 P.2d 755, 757 (Alaska 1980), the court stated that "[i]t is not the function of this court to reweigh the evidence but only to determine whether such evidence exists."

■ This court has stated that there are two means by which an employer may rebut the presumption. "[A]n employer can overcome it by presenting substantial evidence that either (1) provides an alternative explanation which, if accepted, would exclude work related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability." *Grainger,* 805 P.2d at 977; *see also Land & Marine Rental Co. v. Rawls,* 686 P.2d 1187, 1188 (Alaska 1984) (presumption rebutted by substantial evidence which affirmatively shows that injury is not work-related or which eliminates all reasonable possibilities that injury is work-related). Since the presumption shifts only the burden of production to the employer and not the burden of proof, the evidence tending to rebut the presumption should be examined by itself in determining whether substantial evidence has been presented. *Veco, Inc. v. Wolfer,* 693 P.2d 865, 869 (Alaska 1985).

■ In the present case, the Board held that B & B had presented substantial evidence establishing that the injury complained of was not work-related. In reaching this conclusion, the Board relied upon the testimony of Dr. Davidhizar, Gillispie's personal physician, and Drs. Donald and Christine Peterson, the two physicians employed by B

---

**2.** Whether substantial evidence has been presented to rebut the presumption is a question of law, subject to independent review by this court.

*Grainger v. Alaska Workers' Comp. Bd.,* 805 P.2d 976, 977 (Alaska 1991).

& B's insurance carrier to investigate Gillispie's claims. The superior court concurred in this determination. We affirm the Board's finding that this evidence was sufficient to rebut the presumption.

Dr. Davidhizar, by Gillispie's own admission, is the physician who best knew her condition. He testified that the incidents at B & B merely caused temporary aggravations of Gillispie's prior back problems and that after each of the injuries, she returned to her pre-existing condition that he had been treating for the previous seven years. He also testified that he did not feel that the herniation diagnosed by Dr. Reinbold "was really a factor in her clinical symptoms," noting that "she may have had that disc for years."

Likewise, Drs. Donald and Christine Peterson also testified that they did not feel that the herniation revealed in the CAT scan was clinically significant. In addition, both suggested that Gillispie's complaints derived from and were subordinate to her drug-seeking behavior. Most importantly, both testified that the incidents at B & B were not substantial or significant factors in bringing about her condition.[3]

In support of her argument that the presumption was not rebutted, Gillispie relies on the statement in *Childs v. Copper Valley Electric Ass'n*, 860 P.2d 1184, 1189 (Alaska 1993), that "medical testimony cannot constitute substantial evidence if it simply points to other possible causes of an employee's injury or disability, without ruling out work-related causes." She argues that none of the doctors whose testimony was relied upon by the

Board were able to definitively eliminate the possibility that the incidents at B & B caused Gillispie's back injury.

Gillispie misconstrues the rule set forth in *Childs*. In *Childs*, the employee sought workers' compensation benefits claiming that his chronic breathing disorder was caused by work-related smoke inhalation. *Id.* at 1186. The evidence presented before the Board included the testimony of Dr. Lee Newman, who had been hired by the employer to investigate the claim. Though Dr. Newman was unable to "totally rule out a link between the smoke inhalation incident and [the claimant's] continued problems, he did not think that such a link was at all likely." *Id.* at 1187.

In affirming the Board's conclusion that substantial evidence had been offered to rebut the presumption, we addressed the weight to be accorded Dr. Newman's testimony. We stated that "the fact that Dr. Newman, like many medical professionals, did not state his opinion in absolute terms does not mean that his testimony was inconclusive or that he failed to exclude smoke inhalation as a cause of [the claimant's] condition." *Id.* We further noted that "[a]n employer has always been able to rebut the presumption of compensability with an expert opinion that 'the claimant's work was probably not a substantial cause of the disability.'" *Id.* (quoting *Big K Grocery v. Gibson*, 836 P.2d 941, 942 (Alaska 1992)).

In the present case, Drs. Peterson and Peterson both testified that, in their opinion, the incidents at B & B were not substantial factors in bringing about Gillispie's condition. Moreover, Dr. Davidhizar testified that after

---

**3.** Gillispie argues that the testimony of Drs. Peterson and Peterson cannot constitute substantial evidence in light of their limited examination of Gillispie. The doctors' evaluation consisted of an interview with Gillispie, a review of her medical history, and a thirty-minute physical examination.

In support of her argument, Gillispie relies on *Black v. Universal Serv. Co.*, 627 P.2d 1073 (Alaska 1981). In *Black*, we held that the medical testimony of a doctor whose examination consisted solely of a twenty-minute interview with the claimant and a brief examination did not constitute substantial evidence. *Id.* at 1075–76 and n. 9. We based our holding on the fact that the testimony in question stood alone in its conclusions and was contrary to the testimony of the

numerous physicians who had actually treated the claimant. *Id.* at 1075.

In the present case, the Petersons' testimony does not stand alone as evidence that Gillispie's injuries were not compensable, nor does it contradict the testimony of Gillispie's treating physician, Dr. Davidhizar. Thus, this case is more analogous to *Childs v. Copper Valley Electric Ass'n*, 860 P.2d 1184, 1189–90 (Alaska 1993), in which we approved the Board's partial reliance upon the medical testimony of a doctor who had reviewed the claimant's medical records, but had not examined the claimant. In *Childs*, we expressly noted that the doctor's testimony did not stand alone and was in fact consistent with other evidence presented. *Id.* at 1189.

each of the incidents, Gillispie returned to her pre-existing condition which Davidhizar had been treating for several years. This evidence clearly constitutes "such relevant evidence as a reasonable mind might accept as adequate" to support the conclusion that Gillispie's injuries were not compensable. *See Grainger,* 805 P.2d at 977 n. 1. Thus, the decision of the Board that B & B rebutted the presumption of compensability with substantial evidence is affirmed.[4]

### 3. *Proving the Claim by a Preponderance of the Evidence*

Once the employer produces substantial evidence to rebut the presumption of compensability, the presumption vanishes and the employee must prove the elements of his or her claim by a preponderance of the evidence. *Veco,* 693 P.2d at 870. In reviewing the Board's decision as to whether a claimant has established his or her claim by a preponderance of the evidence, we must determine whether the Board's findings are supported by substantial evidence in light of the whole record. *Delaney v. Alaska Airlines,* 693 P.2d 859, 863 (Alaska 1985), *disapproved on other grounds by Wade v. Anchorage School Dist.,* 741 P.2d 634, 639 (Alaska 1987); *see also Resler v. Universal Servs.,* 778 P.2d 1146, 1149–50 (Alaska 1989) (holding Board's finding that claimant failed to prove claim by preponderance of evidence to be supported by substantial evidence).

In the present case, the Board concluded that Gillispie failed to prove her claim by a preponderance of the evidence. In so holding, the Board relied on the medical testimony of Drs. Peterson, Peterson, and Davidhizar, as discussed above.

The court also noted that Gillispie herself was not a reliable witness. In particular, the Board noted that Gillispie had misrepresen-

ted her medical history on her employment application health questionnaire, stating that she had never been treated for back problems. The questionnaire also indicated that Gillispie did not suffer from headaches and that she had never been treated for mental illness. These assertions were also false. Based on these misrepresentations, the court discounted the testimony of Drs. Reinbold and Cooper to the extent they relied on Gillispie's statements in reaching their conclusions.[5] Indeed, Dr. Reinbold recognized the possibility that he would reassess his conclusions regarding Gillispie's condition if it were established that she had lied to him regarding the timing of the onset of her back pain.

In addition, Dr. Reinbold, whose testimony Gillispie principally relied upon to establish that her injury occurred as a result of the incidents at B & B, testified that he could not determine for certain when the ruptured disc occurred. More importantly, Dr. Reinbold himself stated that, while any of the falls at B & B could have caused Gillispie's injury, the three falls were "probably insignificant. I mean, with a long history like she had, what significance did those have?"

Based on the above evidence, we affirm the Board's conclusion that Gillispie failed to establish the compensability of her claim by a preponderance of the evidence. Clearly, the Board's conclusion is supported by substantial evidence in light of the whole record.

### CONCLUSION

For the reasons outlined above, the Board's conclusion that Gillispie's injuries were not compensable is AFFIRMED.

---

**4.** Gillispie also relies on *Rawls* and *Kessick,* two cases in which we concluded that the employer failed to present substantial evidence to rebut the presumption. In both *Rawls* and *Kessick,* the Board held the employee's claim not compensable. In reaching this conclusion, the Board disregarded the only medical testimony presented, on the grounds that the testimony was based on information given to the treating doctor by the claimant, whom the Board determined to be untrustworthy. *Rawls,* 686 P.2d at 1189; *Kessick,* 617 P.2d at 757–58. In reversing the Board's decision in both cases, we found deter-

minative the fact that the evidence in question was the *only* competent medical testimony presented. *Rawls,* 686 P.2d at 1190; *Kessick,* 617 P.2d at 758. In the present case, however, substantial medical testimony was offered indicating that Gillispie's injuries were not compensable. Thus, *Rawls* and *Kessick* are clearly distinguishable.

**5.** Under AS 23.30.122, it is for the Board to determine and weigh the credibility of witnesses.